WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jay Lynn Pember,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>Charles L. Ryan, et al.,<br><br>　　　　　　Defendants. | No.  CV 11-2332-PHX-SMM (JFM)<br><br>**O R D E R** |

Plaintiff Jay Lynn Pember, who is a prisoner in the custody of the Arizona State Prison Complex-Florence ("ASPC-Florence"), brought this civil rights case pursuant to 42 U.S.C. § 1983.  (Doc. 18.)  Defendants Baird, Crabtree, Daniels, Ford, Freeland, Heet, Ramos and Woods move for summary judgment, and Plaintiff opposes.[1]  (Docs. 73, 81.)

The Court will grant Defendants' Motion.

**I.    Background**

On February 13, 2013, Plaintiff filed his First Amended Complaint, asserting that he was denied constitutionally adequate medical care in Count I and that he was denied due process regarding his classification in Count II.  (Doc. 18.)

Plaintiff seeks injunctive and declaratory relief, as well as damages.

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (*en banc*), regarding the requirements of a response.  (Doc. 75.)

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated a claim in Counts I and II and directed Defendants Baird, Doe and Crabtree to answer Count I and Defendants Payne, Ford, Danels, Wood, Ramos, Freeland, Heet, and Crabtree to answer Count II of the First Amended Complaint. (Doc. 19.)[2]

On June 30, 2014, Defendants Baird, Crabtree, Daniels, Ford, Freeland, Heet, Ramos and Woods filed their Motion for Summary Judgment (Doc. 73), and Plaintiff filed his Response on September 19, 2014 (Doc. 81.)[3] Defendants filed their Reply on October 8, 2014. (Doc. 83.)

**II.     Summary Judgment Standard**

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party who must demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 250;

---

[2] The Court subsequently ordered the substitution of Matthew Musson for Defendant Doe and ordered Musson to answer Count I of the First Amended Complaint. (Doc. 29.) In a later Order, the Court dismissed Defendants Payne and Musson without prejudice. (Doc. 76.)

[3] In support of their Motion, Defendants submitted a Statement of Facts. (Doc. 74 ("DSOF").) Plaintiff's Brief in Opposition contains a Statement of Facts (Doc. 81 ("PSOF") and Plaintiff submitted a separate Statement of Disputed Factual Issues (Doc. 82).

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The opposing party need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968).

When considering a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits or declarations, if any. *See* Fed. R. Civ. P. 56(c). At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But, if the evidence of the non-moving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id.* at 248-49. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment").

**III.  Count I (Medical Care)**

  **A.  Plaintiff's Facts**

On October 15, 2009, Plaintiff had a consultation with neurosurgeon Dr. Abhay Sanan in which Sanan diagnosed a "C5-C6 disk herniation on the right side," a "clear-cut atrophy of the right deltoid," and "fasciculations in the right biceps." (Doc. 81 ¶ 34 and Ex. 19(B) at 2 (indicating that Dr. Sanan reviewed a July 27, 2009 cervical MRI scan).) Dr. Sanan recommended a "C5-C6 anterior cervical diskectomy and arthrodesis." (*Id.* ¶ 35 and Ex. 19(B) at 2.)

After the consultation with Dr. Sanan, Plaintiff only received Tylenol (acetaminophen) for the "unbearable pain," despite submitting numerous HNRs regarding

1    his pain between 2009 through 2011 and asking in his HNRs about the recommended
2    surgery. (Doc. 81 ¶¶ 36, 37, 42.) Plaintiff spoke to many nurses during their medication
3    rounds about his pain, but "no one knew what to do." (*Id*. ¶ 39.) Plaintiff did receive a
4    "communique" dated March 26, 2011, from Nurse Ripley, who wrote: "Consult was
5    written October 2009 for neurosurgery at present Dr. Baird has scheduled you for Appt.
6    (Approved Oct 2010 per notes)." (*Id*. ¶ 39 and Ex. 22.) Plaintiff also asserts that many
7    inmates attempted to assist in getting him to medical after witnessing the pain he was in.
8    (*Id*. ¶ 37 and Ex. 21.)

9    In a Declaration, Plaintiff asserted that "medical staff were aware of [his] medical
10   needs and pain and suffering, purposely ignoring [him]," that "Defendants denied [him]
11   treatment for a 'serious medical need' by leaving [him] to endure the pain and not
12   providing [him] with adequate pain medication and not providing medical treatment to
13   prevent the pain," and that "Defendants were deliberate[ly] indifferent to [his] 'serious
14   medical need' by not providing [him] the recommended surgery after it was diagnosed
15   and recommend[ed] on October 15, 2009." (Doc. 82 at 5-9 ¶¶ 6, 13, 14, 15.)

16   **B.     Defendants' Facts**

17   On September 29, 2011, Plaintiff was taken to see Dr. Marco Marsella, a staff
18   neurosurgeon at the Chandler Regional Medical Center. (Doc. 74 ¶ 29.)[4] After
19   examining Plaintiff, Dr. Marsella concluded that "there is no focal abnormality that
20   requires surgical correction," but that surgical decompression "may be recommended" if
21   further testing found that Plaintiff suffered from nerve entrapment syndrome. (*Id*. ¶¶ 30,
22   31 and Ex. 4.) On January 11, 2012, a neurologist, Dr. Jacek Sobczak, evaluated the
23   results of Plaintiff's nerve conduction testing and concluded that there was
24   "electrophysiologic evidence of very mild, bilateral median neuropathy at the wrist and

---

[4] Plaintiff disputes all of Defendants' statements of fact regarding his medical care and argues that "Defendants are defending themselves after the fact" when Plaintiff's issues began in 2009 after Plaintiff "was diagnosed with a[n] injury and recommended surgery." (Doc. 82 ¶¶ 29-39.) Other than saying the facts are disputed, however, Plaintiff does not say what specifically in DSOF paragraphs 29-39 he disputes.

- 4 -

no electrical evidence of radiculopathy, plexopathy, peripheral polyneuropathy or myopathy." (*Id*. ¶ 32 and Ex. 5.)

On July 17, 2012, Plaintiff again saw Dr. Marsella, who "noted Plaintiff's belief that a neurosurgeon had recommended surgery in 2009," but Dr. Marsella found that Plaintiff's cervical spine MRI "documented no significant changes as well as no abnormality including no evidence of C5-C6 disk herniation." (*Id*. ¶¶ 33, 34 and Ex. 6.) Dr. Marsella noted "very mild bilateral median neuropathy" but "no radiculopathy, plexopathy or peripheral neuropathy." (*Id*. ¶ 35 and Ex. 6.) "Given these 'normal findings,'" Dr. Marsella "discouraged the patient of [sic] about an operation, which has no reason to be completed at this point." (*Id*. ¶ 36 and Ex. 6.) Dr. Marsella wrote that "the lack of substantial findings at this point" led him to "advise against any operation," and he discharged Plaintiff from surgical care. (*Id*. ¶ 37 and Ex. 6.)

According to Defendants, "Dr. Baird or other prison health staff authorized Plaintiff's medications including acetaminophen, unithroid, carbamazepine, and others on June 3, 2010, July 27, 2010, September 2, 2010, September 10, 2010, May 2, 2011, June 15, 2011, and October 17, 2011." (*Id.* ¶ 38.)

Defendant Crabtree, ADC's Administrator of the Offender Services Bureau, "had no role in Plaintiff's medical treatment at all." (*Id*. ¶ 39 and Ex. 3.)

### C.    Governing Standard

To succeed on a medical-care claim under the Eighth Amendment, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard. First, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en

banc) (internal citation omitted). Examples of indications that a prisoner has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. The state of mind required for deliberate indifference is subjective recklessness; however, "the standard is 'less stringent in cases involving a prisoner's medical needs . . . because the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *McGuckin*, 974 F.2d at 1060. Whether a defendant had requisite knowledge of a substantial risk of harm is a question of fact, and a fact finder may conclude that a defendant knew of a substantial risk based on the fact that the risk was obvious. *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

"Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir.2002) (internal citations and quotation marks omitted). Deliberate indifference may also be shown by the way in which prison officials provide medical care, *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988), or "by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm." *Lolli v. County of Orange*, 351 F.3d 410, 421 (9th Cir. 2003). And deliberate indifference may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. But the deliberate-indifference doctrine is limited; an inadvertent failure to provide adequate medical care or negligence in diagnosing or treating a medical condition does not support an Eighth Amendment claim. *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citations omitted). Further, a mere difference in medical opinion does not establish deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

Finally, even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

### D. Analysis

#### 1. Serious Medical Need

The parties do not appear to dispute that Plaintiff had a serious medical need and Defendants make no argument in this regard. The evidence reflects that doctors found Plaintiff's condition both worthy of comment and treatment. (Doc. 81 ¶ 34; Doc. 74 ¶¶ 29-38.) In addition, Plaintiff submitted numerous HNRs over a two-year period reporting that he was in pain and inquiring about his surgery. (Doc. 81-2, Ex. 20.)

On this record, a jury could find that Plaintiff's condition constituted a serious medical need. *See McGuckin*, 974 F.2d at 1059. The Court, therefore, turns to the subjective prong of the deliberate-indifference analysis.

#### 2. Deliberate Indifference

In his First Amended Complaint, Plaintiff alleged that Defendant Crabtree "authorizes final approval for surgery and communicates-coordinates scheduling with [D]efendant F.H.A.-Florence," but that "[a]fter 8 years, the [P]laintiff has still not had surgery nor pain medication relief from the medical department." (Doc. 18 at 14-15.) Defendants argue in their Motion for Summary Judgment that Crabtree, ADC's Administrator of the Offender Services Bureau, "had no involvement in Plaintiff's medical treatment whatsoever." (Doc. 73 at 10.) Plaintiff offers no argument or evidence in response to Defendants' contention that Crabtree had no involvement in his medical treatment. Nor does Plaintiff offer any evidence demonstrating that Crabtree was aware of a substantial risk of harm to Plaintiff or that he disregarded that risk of harm. On this record then, no jury could find that Defendant Crabtree was deliberately indifferent to Plaintiff's serious medical need.

Thus, the Court must now determine whether the remaining Defendant in Count I, Dr. Baird, was deliberately indifferent to Plaintiff's serious medical need. This inquiry analyzes whether Baird had the requisite knowledge of a substantial risk of harm; that is, did Baird know of and disregard a substantial risk to Plaintiff's health. *Farmer*, 511 U.S. at 837. "If a person should have been aware of the risk, but was not, then the person has not violated the Eighth Amendment, no matter how severe the risk." *Gibson v. County of Washoe, Nev*., 290 F.3d 1175, 1188 (9th Cir. 2002) (citing *Jeffers v. Gomez,* 267 F.3d 895, 914 (9th Cir. 2001)).

Defendants argue that Plaintiff "was repeatedly sent to highly-qualified and respected medical specialists to look after his concerns about nerve damage." (Doc. 73 at 10.) Defendants also argue that, even assuming Dr. Sanan did recommend surgery in 2009, "Plaintiff can present no evidence to contradict Dr. Marsella's more recent, and amply supported with lab results, assessment that surgery was not indicated." (*Id*.) Defendants conclude that "even if [Plaintiff] could produce a medical expert to disagree with Dr. Marsella, mere disagreement with a doctor's medical opinions is insufficient as a matter of law when alleging violations of the Eighth Amendment." (*Id*. (citing *Toguchi v. Chung*, 391 F.3d 1051 (9th Cir. 2004)).)

In this case, the Court is presented with differing opinions from medical specialists about the need for surgery. Plaintiff has presented Dr. Sanan's October 2009 consultation report in which Dr. Sanan, a neurosurgeon, found "C5-C6 disk herniation on the right side" and recommended "C5-C6 anterior cervical discectomy and arthrodesis." (Doc. 81-2, Ex. 19 at 2.) Defendants present the September 2011 opinion of Dr. Marsella, a neurosurgeon, who concluded there was no focal abnormality requiring surgical correction but that surgical decompression may be recommended if further testing found Plaintiff suffered from nerve entrapment syndrome. (Doc. 74-4, Ex. 4.) Dr. Sobczak, a neurologist, evaluated the results of Plaintiff's nerve conduction testing and concluded there was very mild, bilateral median neuropathy at the wrist but found no "radiculopathy, plexopathy, peripheral polyneuropathy or myopathy." (Doc. 74-5, Ex.

5.)  When Plaintiff saw Dr. Marsella again in July 2012, Dr. Marsella found that Plaintiff's cervical spine MRI showed no evidence of C5-C6 disk herniation and found no reason for surgery, given these "normal findings." (Doc. 74-6 and Ex. 6.)

These diverse findings and recommendations from two neurosurgeons and a neurologist reflect nothing more than a difference of opinion on the necessity of surgery, and a difference of opinion does not establish deliberate indifference to a serious medical need. *Jackson*, 90 F.3d at 332. Therefore, the Court will grant Defendants summary judgment on Plaintiff's claim in Count I regarding surgery.

Defendants also argue that Plaintiff cannot prove a claim of deliberate indifference against Defendant Baird because Baird "regularly and routinely authorized Plaintiff for pain medication and others." (Doc. 73 at 10.) Plaintiff counters that through the years of complaining about "unbearable pain," he was only prescribed acetaminophen, "which is equal to a mild Tylenol which did not work." (Doc. 81 ¶ 42.) Plaintiff further argues the other medications Defendants say Plaintiff received for pain are actually for "thyroid disorder" (unithroid) and "seizure disorder for epilepsy" (carbamazepine). (*Id*. ¶ 36.)

Plaintiff, however, has presented no evidence that Defendant Baird was deliberately indifferent to his serious medical needs. In fact, the only mention of Baird in Plaintiff's Response is in the context of the communique from Nurse Ripley, who wrote that Baird had scheduled Plaintiff for an appointment. (*See* Doc. 81 ¶ 39 and Ex. 22.) Plaintiff presents no evidence that he ever spoke to or wrote to Baird about his pain or that Baird ever saw or responded to his HNRs.[5] In fact, all of Plaintiff's facts refer to

---

[5] Plaintiff did state in his First Amended Complaint that Baird was present during the 2009 consultation with Dr. Sanan and that after the consultation Plaintiff asked Baird for pain medication and Baird said "he would look into it." (Doc. 18 at 13.) But Plaintiff provided no evidence in his Response to Defendant's Motion that Baird purposefully failed to respond to or was deliberately indifferent to his pain. Indeed, the evidence in the record reflects that Baird did respond to Plaintiff's pain by repeated prescriptions for acetaminophen, as well as prescriptions for ibuprofen, naproxen and gabapentin. (*See, e.g.,* Doc. 74-7, Ex. 7 at 1, 3 and 7.) In fact, one of the HNRs Plaintiff submitted on August 29, 2010 stated that he cannot take the naproxen because it "feels like it is burning a hole in [his] stom[ach]" and he asked to change his prescription back to

"Defendants" or "medical staff" or nurses, without ever mentioning Defendant Baird or how Baird specifically was deliberately indifferent to Plaintiff's serious medical need.

Finally, other than Plaintiff's subjective statements about his pain, he has presented no evidence that the pain medications he was prescribed were not appropriate or that he ever took the prescribed medications. Plaintiff's arguments, at most, present a mere disagreement over the proper treatment his pain, and a disagreement about the course of medical care cannot support an Eighth Amendment claim of deliberate indifference. *See, e.g., Sanchez v. Vild*, 801 F.2d 240, 242 (9th Cir. 1989) ("A difference of opinion does not amount to a deliberate indifference to [plaintiff's] serious medical needs.") Therefore, the Court will grant Defendants summary judgment on Plaintiff's claim in Count I regarding the treatment for his pain.

## IV.   Count II (Due Process)

### A.   Background Facts

ADC classifies inmates in one of four custodial levels: minimum, medium, close, and maximum. (Doc. 74 ¶ 14.) Minimum custody inmates are the lowest risk to public and staff, and maximum custody inmates represent the highest risk. (*Id*. ¶ 15.) Inmates are classified using factors that are "computed into a point system resulting in a final 'score' that is used to calculate the inmate's classification."[6] (*Id*. ¶ 16.) The factors include "indicators of institutional violence, public safety risk, escape risk, risk to staff and other inmates, current and prior criminal convictions, discipline history, gang affiliation, age, program completion, and length of sentence." (*Id*.)

Plaintiff was first incarcerated by ADC in 1988 until 1993. (Doc. 74 ¶ 1.) Plaintiff was re-incarcerated from 1993 to 2000; he re-entered again in 2002 and has been incarcerated since then. (*Id*.) During his deposition, Plaintiff admitted to escaping from

---

acetaminophen. (Doc. 81-2 at 27.)

[6] Although Defendants provide this information on ADC's classification system, they do not actually provide Plaintiff's final score that was used to calculate his classification.

- 10 -

the Towers Jail in 1987 while awaiting sentencing, and to escaping from state prison in 1994. (*Id*. ¶¶ 2-3.) In 2003, Plaintiff was convicted of aggravated assault for striking a police officer with his vehicle while fleeing. (*Id*. ¶ 4.) In 2004, Plaintiff was accused of being involved in a prison riot and assaulting two correctional officers, and he was subsequently convicted by a jury for those assaults. (*Id*. ¶ 5 and Ex. 1 (Pl. Dep.) at 42:23-43:3, Dec. 17, 2013.) Plaintiff was classified as maximum custody following his convictions for the assault of two correctional officers in 2004. (*Id*. ¶ 18.) On March 19, 2008, Plaintiff's classification was reduced to "close custody" because he was "discipline-free," even though he continued to qualify for maximum custody. (*Id*. ¶ 19.)

In 2008, Plaintiff was suspected of involvement in the murder of inmate Timothy Lucero. (Doc. 74 ¶ 6 and Ex. 2 (an ADC Criminal Investigations Unit report stating that Plaintiff and another inmate initially blocked a corrections officer's view of a picnic table under which Lucero was subsequently found slumped).) Because of Plaintiff's suspected involvement in the murder of inmate Lucero on August 27, 2008, he was reclassified to maximum custody on September 4, 2008. (*Id*. ¶¶ 20-21.) Six-month reviews of Plaintiff's classification status took place on November 28, 2008, June 12, 2009, December 28, 2009, July 8, 2010, February 18, 2011 and August 25, 2011. (*Id.* ¶ 23.) At his deposition, Plaintiff testified that beginning in 2009, there were hearings every six months to review his maximum custody classification. (*Id*. ¶ 22 and Ex. 1, Pl. Dep. 29:22-50:01.)[7]

---

[7] DSOF ¶ 22 states, in part, that "Plaintiff's classification to maximum custody was individually reviewed in a hearing every six months, pursuant to [ADC] policy by prison staff." Plaintiff disputes DSOF ¶ 22 and states that his classification was not "individually reviewed," but Plaintiff does not explain what he means by his statement that his classification was not individually reviewed. (Doc. 82 ¶ 22.) Plaintiff cites to his own exhibits 15-17 in support of his contention that his classification was not individually reviewed; those exhibits, however, are merely ADC printouts showing Plaintiff's classification and comments, apparently by classification officials. (*See* Doc. 81-2, Exs. 15-17.) The exhibits do not necessarily indicate that Plaintiff's classification was not individually reviewed.

1 According to Defendant Crabtree, Administrator of the ADC's Offender Services Bureau and previously the Classification Manager for ADC, Plaintiff's classification implicated the following considerations: "history of violent behavior, two known escape attempts, suspected gang membership in the Aryan Brotherhood, convictions of criminal violent acts, and disciplinary violations."[8]  (Doc. 74 ¶ 17 and Ex. 3.)

Plaintiff filed this lawsuit on November 28, 2011.  (Doc. 74 ¶ 24 (citing Doc. 1).)  Plaintiff had more classification reviews on February 24 and August 29, 2012; after the August 2012 review, Plaintiff's classification was reduced to close custody.  (*Id*. ¶¶ 25-26.)  Plaintiff's classification was later reduced to medium custody "for about 10 months," and at the time of the filing of Defendants' Motion for Summary Judgment, Plaintiff was again classified as close custody.  (*Id*. ¶¶ 27-28.)

### B.  Governing Standard

It is well-settled that placement in maximum security segregation units implicates a liberty interest requiring due process protections.  *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005).  An inmate may be deprived of his liberty interest as long as he is accorded the proper procedural protections.  For the initial decision to place an inmate in maximum custody, due process is generally satisfied by notice of the factual basis for the placement and an opportunity to be heard, as these procedural mechanisms serve to avoid the risk of erroneous deprivation.  *Id.* at 224-26; *Hewitt v. Helms*, 459 U.S. 460, 476 (1983), *overruled in part on other grounds by Sandin v. Connor*, 515 U.S. 472 (1995); *see also Cato v. Rushen*, 824 F.2d 703, 706 (9th Cir. 1987) (applying the "some evidence" standard of *Superintendent v. Hill*, 472 U.S. 445, 454 (1985).)  In *Hill*, the Supreme Court stated that "the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board."  472 U.S. at 455-56.  When examining the record, the court is not to make its own assessment of the credibility of

---

[8] Plaintiff disputes that he was an "escape risk" in 2008 or later based only on an escape conviction 18 years earlier.  (Doc. 82 ¶ 17.)

- 12 -

witnesses or reweigh the evidence. *Id.* at 455. But the evidence must have some indicia of reliability. *Cato*, 824 F.2d at 705.

After an inmate is placed in maximum security segregation, he is entitled to "some sort" of periodic review of his status. *See Hewitt*, 459 U.S. at 477, n.9 ("[A]dministrative segregation may not be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of periodic review of the confinement of such inmates.").

### C.   Analysis

Defendants argue that the "undisputed facts make it clear that Plaintiff was never harmed by any violation of due process." (Doc. 73 at 6.) Alternatively, Defendants argue that they are entitled to qualified immunity.

Defendants rely on *Brown v. Oregon Dep't of Corrections*, 751 F.3d 983 (9th Cir. 2014), a case in which the court held that an inmate's 27-month confinement in an intensive management unit deprived him of due process where the inmate received no "meaningful review" of his confinement because his confinement could not have lasted less than 106 weeks, and because he experienced atypical and significant hardship. 751 F.3d at 987-88 (nevertheless finding that the defendants were entitled to qualified immunity). Defendants here argue that Plaintiff admitted under oath that he was given a hearing to review his classification every six months, in contrast to the inmate in *Brown*, and his six-month reviews "actually resulted in reductions from maximum custody." (Doc. 73 at 6.)

In addition, Defendants point to Plaintiff's history of escape attempts, which Plaintiff does not dispute, as well as "convictions for assaulting prison staff, and suspicion of being involved in the homicide of an inmate" as supporting Plaintiff's classification. (Doc. 73 at 6-7.) While Plaintiff denies any involvement in the death of inmate Lucero, Defendants argue that "as long as 'some evidence' supports the factual determination made by prison officials, there was no violation of due process." (*Id.* at 7 (citing *Castro v. Terhune*, 712 F.3d 1304, 1307 (9th Cir. 2013) (citation omitted).)

1  Defendants contend that the "some evidence" standard is easily met here by the homicide
2  investigation alone, where a correctional officer "personally witnessed Plaintiff acting as
3  a screen to block his or her view of the murder of Timothy Lucero." (Doc. 73 at 7.)

4  Plaintiff counters that his placement in maximum custody was not supported
5  because he was never charged with the murder of Lucero in a criminal court or even in a
6  disciplinary report; that he was labeled an escape risk "without any reason or evidence";
7  and he "only received one disciplinary in more than ten (10) years." (Doc. 81 ¶¶ 20, 21,
8  24.) Plaintiff argues that Defendants "completely disregarded the classification policy
9  and procedures and denied [P]laintiff's due process by first refer[r]ing to [D]efendant
10 Stacey Crabtree to solely make her independent decision whether [P]laintiff was
11 reclassed to a lower custody unit." (Doc. 81 at ¶ 44 (citing Exs. 14, 15, 16, 17).)
12 Plaintiff argues that "he was never charged or found guilty of a major disciplinary
13 violation. No new evidence was ever provided to warrant his confinement in super-
14 maximum custody which is a violation of due process of the classification policy, exhibit
15 26." (*Id.* ¶ 45.) In Exhibit 26, Plaintiff provided one page of Department Order 801-
16 Inmate Classification ("DO 801") and highlighted subsection 1.4.5, which states: "Other
17 Major Reason-Substantial justification that the inmate is currently a risk to the public,
18 staff, or other inmates and increased supervision is required. Justification may not
19 duplicate any other override reason(s) or standard criteria." Because Plaintiff only
20 provided one page of DO 801, the court has no context for this one paragraph highlighted
21 by Plaintiff; thus, it is not probative evidence.

22 In *Castro*, the Ninth Circuit Court of Appeals noted the "low hurdle" set by the
23 "some evidence" standard, and that the court does not "examine the entire record,
24 independently assess witness credibility, or reweigh the evidence," as long as the
25 evidence bears "some indicia of reliability[.]" 712 F.3d at 1314-15. In this case, the
26 Court finds that Defendants have provided "some evidence" to support the classification
27 of Plaintiff to maximum custody following the death of another inmate in which a
28 correctional officer said she observed Plaintiff acting as a "screen," as well as Plaintiff's

1  history of escapes and assault. Plaintiff does not dispute that hearings were held every
2  six months while he was in maximum custody. In addition, Plaintiff provided documents
3  showing that he was notified of the rationale for his placement in maximum custody, his
4  appeal rights, and that he submitted at least one appeal of his maximum custody
5  placement. (*See* Doc. 81, Exs. 10, 12, 13, 14.) Plaintiff does appear to dispute the role of
6  Defendant Crabtree in approving his custody level, but he does not explain how
7  Crabtree's role violated his due process rights.

8  Based on this record, where there were periodic reviews of Plaintiff's
9  classification and he was able to exercise his appeal rights, there is some evidence
10 supporting Plaintiff's placement in maximum custody, and a reasonable jury could not
11 find otherwise. Accordingly, the Court will grant Defendants summary judgment on
12 Count II.

13 **IT IS ORDERED:**

14 (1) The reference to the Magistrate Judge is withdrawn as to Defendants'
15 Motion for Summary Judgment (Doc. 73).

16 (2) Defendants' Motion for Summary Judgment (Doc. 73) is **granted** and the
17 action is terminated with prejudice. The Clerk of Court must enter judgment accordingly.

18 DATED this 2nd day of March, 2015.

Honorable Stephen M. McNamee
Senior United States District Judge